953 So.2d 727 (2007)
CITY OF PORT ORANGE and PGCS, Appellants,
v.
Gary SEDACCA, Appellee.
No. 1D05-1799.
District Court of Appeal of Florida, First District.
April 10, 2007.
*728 George A. Helm, III, Lake Mary, for Appellants.
Richard A. Sicking, Coral Gables, for Appellee.

EN BANC
HAWKES, J.
This workers' compensation appeal has been decided en banc, pursuant to the court's own motion. In this case, we are asked to determine whether the Judge of Compensation Claims erred by determining Claimant firefighter's permanent impairment for hypertension, standing alone, constitutes a "disability" under the Workers' Compensation Act.
The answer to this question hinges on the definition of the term "disablement" as used in the occupational disease provisions of the Workers' Compensation Act. Our case law has consistently defined disablement as actual wage-loss. Since Claimant's hypertension has not resulted in wage-loss, he has not suffered disablement, thus, his hypertension is not covered under the Workers' Compensation Act. Accordingly, we reverse.

Facts
The relevant facts are undisputed. The parties stipulated that Claimant, a fire-fighter working for the employer, passed a pre-employment physical examination *729 without evidence of heart disease, hypertension, or tuberculosis. Claimant was diagnosed with hypertension as of June 12, 2003, and reached maximum medical improvement (MMI) on April 2, 2004. As a result of the hypertension, Claimant suffered a permanent physical impairment of between one and ten percent of the body as a whole. The parties agreed that, if the claim were determined to be compensable, benefits would be handled administratively. The only issue to be resolved was whether Claimant's permanent impairment for hypertension, standing alone, constituted a "disability," so as to qualify for coverage under the Workers' Compensation Act as an occupational disease pursuant to section 440.151, Florida Statutes.

Coverage Under the Workers' Compensation Act
The Workers' Compensation Act, Chapter 440, Florida Statutes, provides coverage only "if the employee suffers an accidental injury." § 440.09(1), Fla. Stat. (2002). This coverage prerequisite is commonly referred to as an "injury by accident." Without an injury by accident, the Act provides no coverage and is inapplicable. An exception to the actual "injury by accident" requirement allows an employee's disease or medical condition to be "treated as the happening of an injury by accident" if he is able to establish he has an occupational disease. It is under the occupational disease provisions of section 440.151, Florida Statutes, that Claimant seeks coverage.
For a disease or medical condition to be eligible for coverage as an occupational disease, claimants have the burden of establishing each of the statutory requirements. Here, Claimant's ability to satisfy the "four prong test"[1] that comprises part of the statutory requirements is not at issue, because the parties stipulated to the applicability of the presumption under section 112.18(1), Florida Statutes. However, Claimant must still satisfy the other statutory requirements. In reviewing section 440.151, and the applicable case law interpreting the statute, three points emerge as significant.
One, we do not look beyond section 440.151 to define its relevant terms. See Watkins Eng'rs & Constructors v. Wise, 698 So.2d 294 (Fla.1st DCA 1997) (holding occupational disease provision language of section 440.151, is "plain," and "so long as an occupational disease fits within the criteria enumerated therein, such disease constitutes a compensable injury") (emphasis added). A claimant either meets the requirements for coverage under section 440.151, or he does not. This court has previously refused to incorporate other subsections of the Act to add to or supplement the clearly delineated requirements set forth in section 440.151. See id. at 295.
Two, not every disease or adverse medical condition where employment is a contributing cause, or even the major contributing cause, qualifies as an occupational disease. See Broward Indus. Plating, Inc. v. Weiby, 394 So.2d 1117 (Fla.1st DCA 1981) (reversing JCC's finding that bronchial asthma and vasculitis were occupational diseases). Even where a condition of employment causes a permanent disease, failure to meet the statutory requirements of section 440.151 means the claimant would not be entitled to compensation or benefits under the Act. See id. at 1119, 1121.
Three, since disablement or death is required by the statute, neither compensation nor benefits are available until the *730 employee suffers disablement or death. See Fla. Power Corp. v. Brown, 863 So.2d 364, 365 (Fla.1st DCA 2003) (noting that, even though employee was diagnosed with asbestosis, a permanent disease caused by his employment, since he had not suffered "disablement," his disease was not an occupational disease under the Act).
At issue here is whether Claimant's hypertension resulted in "disablement or death . . . from an occupational disease as hereinafter defined." § 440.151, Fla. Stat. Since section 440.151 defines disablement, this statutory language means hypertension (or any other disease or medical condition where employment is the major contributing cause) will not qualify as an occupational disease unless Claimant meets the statute's definition of disablement.

The Meaning of Disablement
The dissent acknowledges disablement must be established before Claimant can be covered by the Act. However, the dissent fails to use the statutory definition of "disablement" provided in section 440.151. Instead, it resorts to doubtful legislative history,[2] fails to recognize binding precedent, and gives other precedent illogical interpretations. It concludes from this circuitous route that "disability" may be presumed and the term's meaning has been "conflated" with the term "impairment." The plain language of the statute and the case law interpreting it stand in opposition to these conclusions.
Under workers' compensation law, the statute in effect on the date of an employee's accident determines the employee's substantive rights. In an occupational disease case, the employee's last injurious exposure giving rise to eligibility for coverage is the date of accident, and consequently, defines the compensation and benefits available. Here, the record shows Claimant's last injurious exposure was on June 12, 2003.[3] At that time, the statute defined disablement as "the event of an employee's becoming actually incapacitated, partially or totally, because of an occupational disease, from performing her or his work in the last occupation in which injuriously exposed to the hazards of such disease; and `disability' means the state of being so incapacitated." § 440.151(3), Fla. Stat. (2002).[4]
The key phrase of the statutory definition: "actually incapacitated . . . from performing his or her work," can logically only support a wage-loss requirement *731 for disability. The word "actually" is self-explanatory and does not mean "presumed." "Incapacitated" is defined as "to deprive of capacity or natural power." See Merriam-Webster's Collegiate Dictionary 628 (11th ed.2003). The question then becomes "deprived of the capacity or natural power to do what"? The statute provides the answer. A claimant must be deprived of the capacity or natural power to "perform[] . . . his work in the last occupation in which injuriously exposed to the hazards of such disease." § 440.151(3), Fla. Stat. Thus, the statute requires a claimant actually be incapable of performing his work. Until "actually incapacitated," at least partially, no coverage for a disease or medical condition is available under the Act, because a claimant's disease or medical condition has not resulted in disablement as the statute defines that term. See City of Mary Esther v. McArtor, 902 So.2d 942, 944 (Fla.1st DCA 2005) ("Determining whether a person is disabled for purposes of workers' compensation turns on the person's capacity to earn income . . . ").

The Dissent's Time Periods
In setting forth its argument, the dissent identifies three time-periods. These time-periods play a crucial role in the dissent's definition of "disablement." They are as follows: any permutation of the workers' compensation statutes prior to 1979, permutations of the statutes between 1979 and 1993, and various permutations of the statutes after the 1993 amendments. In the dissent's view, the 1993 amendments had "the effect of returning Florida's Workers' Compensation Law to its pre-1979 position."[5]See Dissent at p. 737. Although there are many significant differences in workers' compensation law, with various amendments to the Act occurring at least nine times from the 1979 amendments through the 1993 amendments, there is no difference in the occupational disease provision language of section 440.151, nor is there any difference in our case law defining what disablement means in that section.
During each of these time-periods, section 440.151(1) provided coverage for an occupational disease only when it resulted in disablement or death, and section 440.151(3) defined "disablement" as actual incapacity to perform "work in the last occupation in which injuriously exposed." Case law has consistently interpreted this language as defining disablement or disability to require incapacity causing actual wage-loss.

Case Law, The Time-Periods, and "Disability"
The first time-period the dissent identifies as critical, is prior to 1979. The dissent maintains the definition of "disablement" from any permutation of the statute prior to 1979 is also the current definition of "disablement." Significantly, the case law from this period defines "disablement" as the incapacity to work resulting in actual wage-loss. For example, in 1961, the Florida Supreme Court defined disability in this manner in Conner v. Riner Plastering Co., 131 So.2d 465 (Fla.1961). The Conner claimant developed contact dermatitis, which became permanent in 1955. Although having a permanent disease, suffering medical problems, experiencing discomfort, and relying on various home remedies and weekends for time to recuperate to enable his return to work the next *732 week, the claimant was able to continue to work without any lost time from the time the disease was found to be permanent in 1955, until 1959.
The Florida Supreme Court found that, although the claimant suffered from a disease that was permanent in nature and occupational in causation, he did not become disabled and eligible for compensation until January of 1959. The 1959 date marked the date of his disability because that was when his doctors advised him he could no longer perform plastering work. It was not until he lost his ability to perform plastering work that he became "actually incapacitated," experienced actual wage-loss, and, as a result, became disabled or suffered "disablement."
The Florida Supreme Court reversed the deputy's award of compensation, ruling the deputy erred by basing entitlement to compensation on the date the disease became permanent. The Court held "the controlling factor should be the time the disability became permanent. After all, it is the disability not the disease itself which determines whether the claim is compensable." Id. at 467. (Emphasis in original). The error the deputy made in Conner is the same error the dissent makes here, confusing the date of diagnosis or contraction of a disease with the date the disease progresses to the point a claimant's ability to work is adversely affected, i.e., he suffers disability. Realistically, it is possible that a permanent disease may never result in disability.
The Florida Supreme Court reached the same result in Dayron Corp. v. Morehead, 509 So.2d 930 (Fla.1987). Morehead was decided during the second time-period the dissent identifies as being critical to its analysis. The Morehead claimant became sensitive to an oil-based coolant used in metal cutting. Due to his sensitivity, he was unable to perform his job. The Court concluded that, since he was unable to perform his job, he suffered a disability. There are two points of interest in Morehead.
First, the Florida Supreme Court quoted the AMA Guides' caution against confusing the terms "disability" and "impairment." Id. at 931. Here, the dissent again commits the very error the Florida Supreme Court and the AMA Guides caution against by confusing these two terms. Specifically, impairment is a medical assessment, without regard to the wage-loss that may result in disability. See id. at 932. Disability is a legal issue, which considers a claimant's ability to work, and requires economic loss. See id. at 931-932.
The second point of interest is the Morehead Court's citation to Conner as precedent for its holding that disability requires actual wage-loss. The Court's citation confirms that since the statutory language had not changed, the meaning of disablement had not changed. The Morehead Court's holding is contrary to the dissent's premise that there is a difference in the definition of "disablement" in any permutation of the statutes prior to the 1979 amendments, and the various permutations of the statutes in the 1979-1993 time-period.
There are other cases in this 1979-1993 time-period that hold a disease or medical condition does not qualify as an occupational disease unless the claimant can show disablement, i.e., being "actually incapacitated," resulting in actual wage-loss. All of these cases recognize disability is different from impairment. See OBS Co., Inc. v. Freeney, 475 So.2d 947 (Fla. 1st DCA 1985) (holding claimant disabled even without permanent impairment rating because of inability to work in his occupation. Thus, he suffered "incapacity because *733 of the injury to earn in the same or any other employment the wages which [he] was receiving at the time of the injury."); Sledge v. City of Ft. Lauderdale, 497 So.2d 1231 (Fla.1st DCA 1986) (finding no disability where claimant, a firefighter, was able to continue working even though he had permanent heart disease and a 1% permanent impairment rating; since there was no disability, there was no occupational disease; noting distinction between injury by accident and occupational disease is important, because in occupational disease cases, the date of disability coincides with the loss of earnings). No loss of earnings means no disability. No disability means no occupational disease.
In the third time-period utilized by the dissent, after the 1993 amendments, the case law continues to define disablement or disability as used in section 440.151 as requiring actual wage-loss. See City of Mary Esther, 902 So.2d at 944 (noting disablement for purposes of workers' compensation turns on claimant's ability to earn income). Case law in this time-period continued to recognize a difference between the disease (an impairment) and a disability. In occupational disease cases, it is the disability, not the disease, which determines compensability of a claim. See Hoppe v. City of Lakeland, 691 So.2d 585 (Fla.1st DCA 1997). The employee must become "actually incapacitated, partially or totally, because of the occupational disease." Id. at 586.
Another case from that time-period, which recognizes the definition of disability requires actual wage-loss is Michels v. Orange County Fire/Rescue, 819 So.2d 158 (Fla.1st DCA 2002). The Michels claimant suffered from Hepatitis C caused by his employment. The disease was diagnosed in March of 1992. Obviously, Hepatitis C is permanent. Between the 1992 diagnosis and 1996, the Michels claimant underwent interferon therapy. When diagnosed with the disease, he was earning $35,000.00 per year. However, after treatments, he returned to work full-time, performing full duties and, as the case points out, even assumed additional responsibilities, received a promotion and worked a second job.
On September 18, 1998, the Michels claimant became incapable of performing his work. At that time, he was earning $69,000 per year. The JCC held the 1992 date the disease was diagnosed was the date of the accident. This court reversed, holding it is "well-settled in occupational disease cases that the date of accident is the date of disability, and disability is defined as the date claimant became incapable of performing work in the last occupation in which he was exposed to the hazards of the disease." Id. at 160. (Emphasis added). The Michels court concluded "September 18, 1998, is the date claimant's condition deteriorated to the point he was permanently precluded from working because of his disease. Thus, [claimant's] disablement and date of accident for this claim is September 18, 1998." Id. (Emphasis added). Clearly, this court found the disablement necessary to establish an occupational disease was an incapacity to work, which results in actual wage-loss.
To obtain coverage under the Act, a claimant proceeding under the occupational disease provisions must establish "disablement." Disablement as used in section 440.151 has consistently, through each of the dissent's time-periods, been defined in only one way. To establish disablement, the claimant must suffer actual wage-loss because of an incapacity to perform his work as a consequence of his disease or medical condition.

*734 Manatee Memorial Hospital and Robinson

The dissent cites Manatee Mem'l Hosp. v. Special Disability Trust Fund, 774 So.2d 876 (Fla.1st DCA 2000), and Magic City Bottle & Supply Co. v. Robinson, 116 So.2d 240 (Fla.1959) as precedent supporting its reasoning. The dissent is mistaken. Nothing in either of these cases supports the dissent's reasoning.
Manatee does not hold that an "impairment" is synonymous with a "disability," or that the terms have been "conflated." The case actually stands for the proposition that the concept of impairment is different from the concept of disability. The language from the case makes this clear. "[I]mpairment income is payable irrespective of disability." Id. at 878. (Emphasis added). If the case stood for the proposition for which it is offered by the dissent, the language would read "impairment is disability."
The entire premise of Manatee is that "permanent impairment" and "disability" are different, and, by holding the claimant did not have to establish disability to receive permanent impairment benefits, this court recognized that difference.
The dissent's premise is that, since permanent impairment benefits under section 440.15(3) do not require a claimant to establish disability, then disability may be presumed under section 440.151 any time a claimant has a permanent impairment. In other words, the dissent reasons, Claimant can use the benefit provisions of section 440.15(3), to satisfy the coverage requirements of section 440.151. The dissent's reasoning is analytically flawed.
The flaw is illustrated by examining the Manatee claimant's status. Specifically, the Manatee claimant was not seeking coverage, he was seeking benefits. The Manatee "claimant was injured on July 3, 1995." Id. at 877. Thus, he suffered an injury by accident under section 440.09, and his medical condition was covered under the Act. Because the Manatee claimant's medical condition was covered under the Act, one of the benefits to which he was entitled was permanent impairment benefits. The Manatee claimant did not use his impairment to gain coverage, as the dissent attempts to do for Claimant here.
The dissent also attempts to buttress its argument with Robinson, maintaining Robinson creates a conclusive presumption that any impairment automatically results in some degree of disability, i.e., a loss of earning capacity. Besides the fact that the case never uses the word "impairment," there are two additional problems with the dissent's reliance on Robinson.
First, the issue in Robinson was "the exact degree of [claimant's] disability under F.S. § 440.15(3)(s), F.S.A." Robinson, 116 So.2d at 242. The Court was not determining if the Robinson claimant had a disability. Instead, the Court was determining the extent of the disability. Like Manatee, the Robinson claimant suffered an injury by accident "when a piece of machinery struck his left leg breaking two bones near the ankle joint." Id. at 241. Consequently, the Robinson claimant's medical condition was covered under the Act. Once covered, the only question becomes the type of benefits and the amount of compensation to which the claimant is entitled.
The Florida Supreme Court explained the presumption is intended to avoid the unfairness of appraising the impact of a permanent injury on earning capacity by looking at some relatively short period preceding the hearing for a claimant already covered under the Act. See id. at 243. The Court's explanation demonstrates the presumption that a scheduled *735 injury automatically results in wage-loss is not intended to address whether a claimant's medical condition is covered by the Act.
The proper inquiry in every case involves two steps. First, a determination must be made as to whether a claimant's medical condition is covered under the Act. The medical conditions in Manatee and Robinson were determined to be covered by the Act. Second, if covered, a determination must be made as to what benefits are due. If the first step results in a determination that a medical condition is not covered under the Act, the second step becomes moot, because no benefits are due. It is logically incoherent to argue that, since there could be benefits, there must be coverage.
Second, evidence of the flaw in the dissent's reliance on Robinson can be found from the lack of any reference to Robinson in any of the occupational disease cases over the last 47 years. For example, Conner, the contact dermatitis case in the first time-period, Michels, the Hepatitis C case in the second time-period, and City of Mary Esther, the heart disease case in the third time-period, all fail to cite Robinson. Even though each of these cases found a disease permanent in nature and occupational in causation, none of these cases held Robinson created a presumption of wage-loss and, therefore, disability. Each of these cases hinged on the claimant's actual incapacity to work, not whether he had a disease or impairment. Essentially, the Robinson presumption that a scheduled injury results in wage-loss goes to the valuation of a claimant's benefits, but in no way addresses a claimant's initial entitlement to coverage under the Act.

Conclusion
Here, Claimant's hypertension has not caused him to miss any work, thus he cannot demonstrate an incapacity resulting in actual wage-loss. Without incapacity resulting in actual wage-loss, Claimant cannot show disablement. Without disablement, Claimant's hypertension does not meet the statutory definition of an occupational disease. Without an occupational disease, Claimant's hypertension cannot "be treated as the happening of an injury by accident." Without an injury by accident, a necessary prerequisite to the applicability of Chapter 440, Claimant's hypertension is not covered under the Act. Without coverage under the Act, Claimant is not eligible for benefits under section 440.15(3). The JCC's final order is REVERSED.
ALLEN, KAHN, DAVIS, PADOVANO, LEWIS, POLSTON, THOMAS, and ROBERTS, JJ., concur.
BENTON, J., concurs in the judgment with written opinion.
WEBSTER, J., dissents with written opinion in which BROWNING, C.J., BARFIELD, WOLF, and VAN NORTWICK, JJ., concur.
BENTON, J., concurring in the judgment.
I write to suggest that the legal question the present case poses, ably explicated by majority and dissenting opinions alike, may have limited practical significance. The present case arises because a statutory presumption combined with a routine physical examination to produce a "permanent impairment" in an employee who had not experienced symptoms.
When employees have been symptomatic and ill enough with occupational diseases to have to miss work, they have thereby suffered "disablement," defined by statute as "an employee's becoming actually incapacitated, partially or totally, because of an occupational disease, from performing *736 her or his work . . ." § 440.151(3), Fla. Stat. (2002); or, since October 1, 2003, a "disability," statutorily defined as "incapacity because of the injury to earn in the same or any other employment the wages which the employee was receiving at the time of the injury." § 440.02(13), Fla. Stat. (2003); see also § 440.151(1)(a), Fla. Stat. (2003) (requiring that "the disablement or death of an employee resulting from an occupational disease . . . be treated as the happening of an injury by accident").
WEBSTER, J., dissenting.
The majority concludes that a permanent impairment for hypertension does not constitute a "disability" for purposes of section 112.18(1), Florida Statutes (2002), unless there is evidence of actual wage loss. In doing so, it relies on section 440.151, Florida Statutes (2002), which provides that "the disablement . . . from an occupational disease . . . shall be treated as the happening of an injury by accident" and that "`disablement' means the event of an employee's becoming actually incapacitated, partially or totally, because of an occupational disease, from performing her or his work in the last occupation in which injuriously exposed to the hazards of such disease. . . ." § 440.151(1)(a) & (3), Fla. Stat. (2002). According to the majority, this "can logically only support a wage-loss requirement for disability." Maj. Op. at 730-31. Regardless of whether all of this is true, it is irrelevant for purposes of this case.
A fundamental flaw in the majority's analysis is its assumption that the 2002 version of section 440.151 applies. This court has said that the date of accident in occupational disease cases is determined by the date of disability. Michels v. Orange County Fire/Rescue, 819 So.2d 158, 160 (Fla.1st DCA 2002). In this case, the date of disability was April 2, 2004, when claimant reached maximum medical improvement with a permanent physical impairment. Accordingly, this case is governed by the 2003 version of section 440.151 (effective October 1, 2003), which does not contain the definition of "disablement" relied upon by the majority but, rather, merely refers to section 440.02(13) which provides that "`[d]isability' means incapacity because of the injury to earn in the same or any other employment the wages which the employee was receiving at the time of the injury." As I shall explain, pursuant to the "permanent impairment benefits" provisions of section 440.15(3), Florida Statutes (2003), a conclusive presumption arose that claimant was disabled to some degree by his permanent impairment.
Section 440.15, Florida Statutes (2003), is entitled "Compensation for disability" and provides for four types of compensation: (1) permanent total disability benefits; (2) temporary total disability benefits; (3) permanent impairment benefits; and (4) temporary partial disability benefits. Although the statute does not explicitly provide for "permanent partial disability" benefits per se, those who suffer permanent impairments but are not totally disabled are entitled to permanent impairment benefits calculated according to a schedule under section 440.15(3). While observing that a claimant is not required to prove actual disability to receive permanent impairment benefits, see Manatee Mem'l Hosp. v. Special Disability Trust Fund, 774 So.2d 876, 878 (Fla.1st DCA 2000), we have said that such benefits are still intended to compensate for disability because Florida adheres to the theory that an injured worker should be compensated for loss of earnings rather than the injury itself. Brannon v. Tampa Tribune, 711 So.2d 97 (Fla.1st DCA 1998). In short, in creating "permanent impairment benefits," the legislature has conflated the concepts *737 of "permanent impairment" and "disability." In other words, some degree of disabilityi.e., loss of earning capacityis conclusively presumed by the fact the claimant suffers from a permanent impairment.
This conclusion is supported by an examination of the history of section 440.15(3). Prior to 1979, section 440.15(3) provided for "permanent partial disability" benefits which were payable without proof of actual wage loss if the claimant suffered a scheduled injury. In addressing the theory behind "permanent partial disability" benefits for scheduled injuries, our supreme court explained:
There is some intimation that the petitioner considers that because the injury was a scheduled one, the legislature did not historically have in mind the economic factors involved when a permanent partial disability was to arise under this section. Nothing could be less accurate. The underlying principle of compensation lawall compensation lawis that benefits relate to loss of earning capacity and not to physical injury as such. In scheduled benefits the basic theory remains the same; the only difference is that the effect on earning capacity is a conclusively presumed one, based on observed probabilities in many similar cases, instead of a specifically proved one, based on the individual's actual wage-loss experience.
Magic City Bottle & Supply Co. v. Robinson, 116 So.2d 240, 243 (Fla.1959) (footnote omitted).
In 1979, our legislature amended the Workers' Compensation Law by re-establishing the centrality of the wage-loss principle. See 4 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 80.06[1] (2005). Specifically, section 440.15(3) was rewritten to replace "permanent partial disability" benefits with "permanent impairment and wage-loss benefits." Ch. 79-40, § 10, at 230, Laws of Fla. Permanent impairment benefits did not require a showing of actual loss of earning capacity but were awarded only in cases of "permanent impairment due to amputation, loss of 80 percent or more of vision, after correction, or serious facial or head disfigurement resulting from an injury other than an injury entitling the injured worker to permanent total disability benefits." Id. In all other cases of permanent impairment, the claimant had to seek "wage-loss benefits," which were "based on actual wage loss." Id. Thus, except in very limited circumstances, a permanent impairment was not sufficient to entitle an injured worker to benefits unless there was evidence of an actual loss of earning capacity.
However, beginning in 1993, the legislature enacted amendments that had the effect of returning Florida's Workers' Compensation Law to its pre-1979 position. See 4 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 80.06[2] (2005). Effective January 1, 1994, the legislature amended section 440.15(3) by expanding "permanent impairment benefits" to become the primary benefit, payable "at the rate of 3 weeks for each percentage point of impairment." Ch. 93-415, §§ 20, 112, at 121-22, 215, Laws of Fla. At the same time, the legislature reduced "wage-loss benefits" to a supplemental benefit payable at the end of the impairment period to those with impairment ratings of 20 percent or more who earned less than 80 percent of their average weekly wage as a direct result of the impairment. Ch. 93-415, § 20, at 122, Laws of Fla. Effective October 1, 2003, the legislature eliminated supplemental wage-loss benefits altogether, leaving only permanent impairment benefits, payable according to a modified schedule. Ch.2003-412, *738 §§ 18, 50, at 3920-24, 3969, Laws of Fla. One can only conclude that, by eliminating wage-loss benefits in favor of permanent impairment benefits, the legislature has returned to the pre-1979 theory announced by our supreme court that some degree of disabilityi.e., loss of earning capacityis conclusively presumed where compensation is based on a statutory schedule. See Brannon v. Tampa Tribune, 711 So.2d 97, 100 (Fla.1st DCA 1998) (holding that the legislature is presumed to know how the judiciary has construed a law when enacting a new version of that law and to have adopted prior judicial constructions unless a contrary intent is expressed in the new version).
It is the presumption of disability created by a section 440.15(3) permanent impairment that satisfies the "disablement" requirement of the occupational disease provisions of section 440.151(1)(a), Florida Statutes (2003), and the "disability" requirement of the compensability presumption of section 112.18(1), Florida Statutes (2003). The majority's conclusion that a permanent impairment is not a disability for purposes of either section 440.151(1)(a) or section 112.18(1) without a showing of an actual loss of earning capacity makes sense only under the old wage-loss system which no longer exists. See Sledge v. City of Fort Lauderdale, 497 So.2d 1231, 1233 (Fla.1st DCA 1986). Assuming that the claimant had established an actual loss of earning capacity, there would be no way to compensate him for that loss because wage-loss benefits have been eliminated. The only compensation available to those with permanent impairments who are not totally disabled are permanent impairment benefits, which do not require a showing of an actual loss of earning capacity. However, if one follows the majority's reasoning to its only logical conclusion, the claimant in this case must prove a loss of earning capacity to receive permanent impairment benefits. This is simply not required by section 440.15(3).
In concluding that a permanent impairment for hypertension does constitute a "disability" for purposes of section 112.18(1), I have relied on the doctrine of in pari materia which "requires that statutes relating to the same subject or object be construed together to harmonize the statutes and to give effect to the Legislature's intent." Fla. Dep't of State, Div. of Elections v. Martin, 916 So.2d 763, 768 (Fla.2005). The majority's analysis does not comport with this important principle of statutory construction because it does not give effect to the permanent impairment provisions of section 440.15(3). Accordingly, I dissent.
NOTES
[1] Lake v. Irwin Yacht & Marine Corp., 398 So.2d 902 (Fla.1st DCA 1981). The four prong test has been legislatively expanded for any date of accident after October 1, 2003.
[2] There is no legislative history supporting the conclusions reached by the dissent. However, since section 440.151 is clear and unambiguous, we cannot look beyond its plain language or resort to rules of statutory construction to ascertain intent. Our court, en banc in a workers' compensation case, acknowledged this rule, holding this "maxim applies even where a court is convinced that the legislature really meant and intended something not expressed in the phraseology of the act . . ." Vegas v. Globe Sec. & CIGNA, 627 So.2d 76, 84 (Fla.1st DCA 1993) (citations and internal quotations omitted). In Vegas, this court was convinced the Legislature wished to alter the computation of the average weekly wage, but failed in their attempt. Courts' failure to apply statutes as written constitutes an abrogation of legislative power. Koile v. State 934 So.2d 1226 (Fla.2006).
[3] The JCC found the date of accident is the date Claimant reached maximum medical improvement (MMI). There is absolutely no legal support for a finding that the date of MMI is synonymous with the date of accident or, in the occupational disease context, the date of disability.
[4] Effective October 1, 2003, the Legislature amended the statute to define "disablement" to mean "disability" as set forth in section 440.02(13). See § 440.151(3), Fla. Stat. (2003). The definition in section 440.02(13), expressly requires wage loss for disability.
[5] It is difficult to ascertain from the dissent whether the 1993 amendments returned Florida to the pre-1979 theory, or if this was accomplished by the 2003 amendments. The dissent seems to credit both. The 2003 amendments do not apply here since they were not effective until October 1, 2003, and, if Claimant's hypertension has resulted in disability, his date of accident would be June 13, 2003, not the later date of MMI.